```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,      )   No. 21 CR 316
 4                                  )
                   vs.              )   Chicago, Illinois
 5                                  )
     MATTHEW SCHWARTZ,              )
 6                                  )   June 1, 2021
                   Defendant.       )   2:00 p.m.
 7

 8                     TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HON. SUSAN E. COX
 9

10   APPEARANCES:

11   For the Government:    MS. KAITLIN G. KLAMANN
                            United States Attorney's Office,
12                          219 South Dearborn Street, Room 500,
                            Chicago, Illinois  60604
13
     For the Defendant:     MR. DONALD J. COSLEY
14                          Law Offices of Donald J. Cosley,
                            1855 Rohlwing Road, Suite D,
15                          Rolling Meadows, Illinois  60008

16

17

18

19

20

21

22
                           PATRICK J. MULLEN
23                      Official Court Reporter
                     United States District Court
24               219 South Dearborn Street, Room 1412
                       Chicago, Illinois  60604
25                         (312) 435-5565
```

(Telephonic proceedings on the record.)

THE CLERK: 21 CR 316, U.S.A. versus Matthew Schwartz.

THE COURT: Good afternoon, everyone. This is Judge Cox. If I could have the lawyers enter their appearances, starting with the prosecutor.

MS. KLAMANN: Good afternoon, Your Honor. Kaitlin Klamann on behalf of the United States.

THE COURT: Good afternoon.

MR. COSLEY: Attorney Donald Cosley, C-o-s-l-e-y, on behalf of Matthew Schwartz.

THE COURT: Good afternoon, Mr. Cosley, and good afternoon to you, Ms. Schwartz.

MR. DEFENDANT: Thank you.

THE COURT: We also have on the line the pretrial services officer, Kathryn Chapman, and a special agent.

I'm sorry. I didn't catch your last name.

AGENT GROFF: Holly Groff, G-r-o-f-f.

THE COURT: Okay. Thank you.

All right. So we're here for Mr. Schwartz's detention hearing. I just -- the first thing I want to ask is whether everyone has had an opportunity to view the pretrial services report. Ms. Klamann, have you seen it?

MS. KLAMANN: I have, Judge. Thank you.

THE COURT: Okay. And, Mr. Cosley, you as well?

MR. COSLEY: Yes, I have.

1  THE COURT: Okay. I also want to state for the record
2 that I received via email from my deputy Nakita Perdue certain
3 exhibits that the Government will -- upon which the Government
4 will rely for this hearing, and I just want to ask Ms. Klamann
5 to state on the record that those exhibits were also shared
6 with Mr. Cosley prior to the hearing.
7  MS. KLAMANN: They were, Your Honor. Mr. Cosley was
8 cc'd on the same email sent to your deputy.
9  THE COURT: All right. So why don't we start. This
10 is the Government's motion and obviously it's their burden, so
11 we'll begin with you, Ms. Klamann. Your argument pertains to
12 the defendant's potential danger to the community and not that
13 he's a flight risk. Am I correct in that?
14  MS. KLAMANN: That's right, Your Honor, though we are
15 going to argue that defendant failed to follow court orders.
16  THE COURT: Okay.
17  MS. KLAMANN: So in that respect I guess we are making
18 an argument that he's a risk of flight.
19  THE COURT: Okay. All right. Well, why don't you
20 begin with your presentation.
21  MS. KLAMANN: Thank you, Your Honor.
22  Your Honor, the Government believes defendant should
23 be detained because there is no condition or combination of
24 conditions that can reasonably assure the safety of the
25 community or defendant's appearance at trial.

1    I'll start with the nature and circumstances of the
2 offense here.  As set out in the criminal complaint, defendant
3 is charged with transmitting threats to injure the person of
4 another in interstate commerce.  Specifically, on at least
5 three occasions from May to November of 2020, defendant sent
6 threatening text messages to the victim identified as
7 Individual A in the complaint, who is the defendant's
8 ex-fiancee.  The Government provided copies of the entirety of
9 those text threads to the Court and to defense counsel.  Those
10 are Detention Exhibits 1 through 3.  I won't read all of those
11 texts, but I'll highlight just a few of them for the Court.
12    THE COURT:  Okay.
13    MS. KLAMANN:  Specifically, on May 31st, 2020, the
14 defendant sent the victim a text message stating, quote:
15    "I'm going to attack the fuck out of you and kill you
16 dead if you do not start talking to me.  I'm not fucking
17 kidding."
18    Later in that same text thread, he stated, quote:
19    "I want to kill you.  I swear to God if you don't come
20 here and talk to me about this shit I'm going to fucking kick
21 your fucking little ass.  I'm going to kick it at my stop" --
22 and I believe he meant -- "and stomp your fucking head to the
23 curb until cracked open.  Fucking hate you, bitch."
24    On November 3rd, 2020, defendant again texted the
25 victim and said, quote:

"You know the end game is designed so that you don't get hurt and, in fact, it ends with you in a good place. I can change that so that ends with you getting ended, and I could end with you getting ended in one of three ways: 1, quick and painless; 2, slow and painful; 3, a kind of living death. But I choose option 4, you not getting ended at all."

Later in the text stream he states, quote:

"Don't fuck with me or I will become those people. I will choose number 2 instead of number 4. Don't be dumb. I don't really want you to hurt you that way. I don't want to do number 1, 2, 3. Don't make me. Don't fuck me up. Don't antagonize me."

Finally, on November 27th, 2020, defendant sent a text message to the victim stating, quote:

"I should have just killed you, but I couldn't live with myself and now the best choice is for me to kill myself."

Later in the text stream he states, quote:

"And now you just ignore me. You think that will make me go away. It just strengthens my resolve. If I decide to kill myself and I'm close to that decision, you could be damn sure I'll be taking you and your flavor of the day with me."

Each of these messages as well as several others that were sent to the victim were sent from disguised phone numbers because the victim had blocked the defendant's phone. Specifically, the Government has learned that the defendant

1 used a mobile application called the Burner app to create these
2 Burner phone numbers which he used to contact the victim and
3 others. Defendant's use of the disguised phone numbers, the
4 content and threatening nature of the messages, and his
5 persistence in contacting the victim over a six-month period
6 all show that this was not a one-off incident where the
7 defendant was angry and said some things out of anger that he
8 didn't mean. Instead, the messages show that he was engaged in
9 a campaign of harassment and intimidation against the victim.
10 Defendant's campaign of harassment didn't consist
11 solely of those text messages. As is set out in the criminal
12 complaint, the defendant also stalked the victim at her home,
13 broke into her house and stole her dog, and prepared a flyer
14 aimed at humiliating and intimidating her that he intended to
15 disseminate to her neighbors. I'll just note, Your Honor, that
16 the Government has no evidence that defendant did, in fact,
17 disseminate that flyer.
18 THE COURT: Okay.
19 MS. KLAMANN: So, Judge, the Government believes the
20 nature and circumstances of the offense here are serious and
21 support a finding that defendant is a danger to the community,
22 namely, to the victim, and that he should be detained pending
23 trial.
24 Turning to the history and characteristics of the
25 defendant, as the pretrial services report notes, defendant has

1 a limited criminal history. The pretrial services report
2 includes information related to a domestic violence incident
3 that took place in March of 2019 in Buffalo Grove.
4     In addition to that incident -- and this is not in the
5 pretrial services bail report -- the victim in this case sought
6 and received an order of protection against the defendant on
7 December 7th, 2020. I provided that to the Court and to
8 defense counsel. It's Detention Exhibit 4.
9     During the time that the order of protection was in
10 place, we know that the defendant contacted the victim at least
11 once. That was on January 21st, 2021. The text messages that
12 defendant sent to the victim on that date were provided to the
13 Court and to defense counsel as Detention Exhibit 5. So there
14 was a court order in place at that time requiring defendant not
15 to contact the victim, and he disregarded that order and
16 contacted her anyway.
17     Despite defendant's representations in that text
18 message, Detention Exhibit 5, defendant also moved to vacate
19 that order of protection I think just a week or two later in
20 February of 2021, and a copy of the notice of that motion is
21 Detention Exhibit 6. That motion to vacate was granted on or
22 about May 14th, 2021, and the order of protection was vacated.
23     Defendant wasted no time in contacting the victim
24 after the order was vacated. He sent her a text message about
25 a week after the order was vacated, and that's Detention

1 Exhibit 7. It appears what he sent her was a GIF of a liquid
2 heart that breaks into several small pieces. In a subsequent
3 text that he sent her, he claims that he meant to send it to
4 someone other than the victim.
5 So while it's true, Your Honor, that defendant has a
6 limited criminal history, the history he does have involves
7 allegations of domestic violence, including against the victim
8 here, and that history indicates his willingness to break court
9 orders.
10 The pretrial services bail report also mentions that
11 defendant has a history of substance abuse, specifically an
12 addiction to crack cocaine. In the pretrial services report,
13 defendant claims that he had last used crack cocaine in
14 December of 2020. During execution of a search warrant at the
15 defendant's residence, law enforcement located what appears to
16 be drug paraphernalia in his home, which indicates he may be
17 continuing to use illegal substances.
18 Lastly, as pretrial services notes, defendant has
19 significant assets, totalling over a million dollars. He
20 recently sold his company for several millions of dollars.
21 That is just to say, Your Honor, that if defendant wished to
22 flee, he would have the means to do so.
23 I'll also just note that defendant had a delay in
24 surrendering to federal agents. Specifically, he was made
25 aware of the warrant for his arrest last Monday, May 24th,

1 about midday, but defendant claimed he was out of state and
2 refused to surrender prior to midday on Wednesday, almost 48
3 hours later.
4 So for all of these reasons, the Government believes
5 defendant's history and characteristics support a finding that
6 he's a danger to the community and a serious risk of flight.
7 With respect to the strength of the evidence, the
8 evidence in this case is strong that defendant sent the
9 communications containing the threats to the victim. As I've
10 already mentioned, the Government obtained records from the
11 Burner app, the mobile application used to create the phones,
12 the phone numbers that he used to send the threatening
13 messages. Those records indicate that the user phone number
14 tied to those numbers from which those threats were sent is a
15 number utilized by the defendant. Specifically, it's
16 subscribed to his company, Nelix, Inc., with a contact name of
17 Matt Schwartz. Additionally, at least one of the IP addresses
18 used by the creator of the Burner phone numbers was subscribed
19 to the defendant at his residence. So the strength of the
20 evidence also supports detention here.
21 Finally, Your Honor, I'll address danger to the
22 community. I've already talked about the threatening text
23 messages defendant sent to the victim from May to November of
24 last year, but there is also more recent evidence of his intent
25 to harm others and to harm himself.

1  Specifically, about two weeks ago on May 16th, 2021,
2 the FBI received information from the Inverness Police
3 Department indicating they received information from an
4 individual claiming to be a friend of the defendant one day
5 earlier on May 15th, 2021. That individual stated that he or
6 she received some disturbing text messages from the defendant.
7  I provided a copy of the email stream from the tipster
8 and Inverness PD as Detention Exhibit 8. That email contained
9 a number of what we now know to be Facebook messages
10 purportedly sent from the defendant. Most concerning to the
11 Government of those messages is the statement, quote:
12  "I don't know how it's come to this. So, yeah, a
13 killing spree/suicide is sounding pretty good these days."
14  That was just over two weeks ago, Your Honor.
15  THE COURT: Okay.
16  MS. KLAMANN: It's the Government's position that
17 defendant should be detained because he's a danger to the
18 victim and a danger to himself. So for all of these reasons,
19 the Government asks Your Honor to detain the defendant pending
20 trial.
21  THE COURT: Thank you, Ms. Klamann.
22  Mr. Cosley?
23  MR. COSLEY: Yes, Judge. My client, as you see from
24 the report, he's 51 years of age. He's got significant ties to
25 Illinois, specifically the northwest suburbs. He's always

1  lived in either Arlington Heights, Buffalo Grove, Inverness, or
2  Schaumburg.  He owns a residence in Schaumburg.  He has a
3  business that's been located in Rolling Meadows, Illinois.
4  　　　　　　He has no criminal cases.  His one criminal case was
5  dismissed in Lake County.  He has three children.  Two are in
6  college, and one is in high school, Buffalo Grove High School.
7  He is a graduate of Buffalo Grove High School himself in 1987.
8  He also graduated from University of Illinois at Champaign in
9  1991.  As far as significant contacts, he still maintains
10 parenting time with his children.
11 　　　　　　The reason why he was not in town on Monday when he
12 was made aware of the arrest warrant is he was picking up his
13 daughter from college.  He contacted me, and I immediately
14 contacted Ms. Klamann on Monday.  I also contacted -- I was in
15 contact with her on Tuesday, and I talked to the FBI agents on
16 Tuesday.  We made arrangements for a voluntary surrender on
17 Wednesday at noon at their Schaumburg office, which we did do
18 right on time.  So he did cooperate in all respects.  He's not
19 a flight risk.  If he was going to flee, he would have done
20 that before surrendering and turning himself in.
21 　　　　　　With regards to the order of protection, Judge, I did
22 represent Mr. Schwartz on the motion to vacate.  He was
23 actually served with the contents by the Cook County Sheriff
24 after the court hearing at 1:30.  We properly filed a motion
25 within 30 days to vacate.  The judge did grant that based on

1 the fact that he had not been served and didn't know of the
2 court date. Then the judge set it for a hearing, for which the
3 petitioner failed to appear, and the judge granted our motion
4 to dismiss and vacate. That's all or that's more of the story
5 with regard to Exhibit No. 6.
6     Judge, with regards to, you know, the case, obviously
7 we're asking that the Court look at whether this was a crime of
8 direct violence. It's just texts to the victim. It's not a
9 crime of terrorism. There's not a minor victim involved.
10 There's no controlled substance involved. There's no firearm
11 or explosive involved. He has significant family ties to the
12 area. He is employed. He's always lived in the community.
13 There's very minimal criminal history, if anything.
14     He's willing to submit to the evaluations as per the
15 recommendations of pretrial. I think he will obtain -- he will
16 comply with all the recommendations. The one I would like to
17 ask about would be the -- if the Court is inclined to release
18 my client, that he be allowed to live on his own and not under
19 the supervision of his parents.
20     He is a 51-year-old male that has two dogs. He has
21 three children that visit him at his home in Inverness. It
22 would be a little difficult for his parents to manage all of
23 that. I would ask, you know, as a fellow 51-year-old, I know I
24 wouldn't want to go live with my parents if I didn't have to
25 and if I had my own home where I could, you know, entertain my

1 dogs and all my other children.

2 Otherwise, he's willing to have no contact with the
3 victim.  He's willing to be monitored and participate in the
4 mental health evaluation.  He won't possess a firearm.  He will
5 abstain from alcohol and drugs.  He will submit to drug testing
6 and participate in substance abuse therapy and maintain contact
7 with pretrial services.

8 So I would ask that he be released on his
9 recognizance, and my client's parents, you know, are available
10 if the Court has any questions for them.  You know, I would ask
11 that -- you know, point out that in 2021, it sounds like from
12 the state's evidence there's been fairly minimal contact
13 between my client and the victim.  Most of it looks like it was
14 in 2020.  There's a couple texts in 2021, but that's it.  So I
15 think he would be compliant, and I would ask that the Court
16 release him with certain conditions.

17 THE COURT:  Thank you.
18 Ms. Klamann, do you have a response?
19 MS. KLAMANN:  No, Your Honor.
20 THE COURT:  Well, I will say this.  I do believe that
21 there would be conditions that could address and ameliorate any
22 risk of flight in this case.  For example, the defendant could
23 put up his home which he owns in full, and there are other
24 things that could be done as well.
25 So to me the issue comes down to the defendant's

1  danger to the victim and to himself, and I have to say I was a
2  little surprised to hear you say, Mr. Cosley, you know, that
3  this isn't -- to sort of minimize the threat of violence here.
4  These texts that make up part of the report of this case are
5  very specific death threats and are repeated at intervals, and
6  they are graphic.  They seem to be -- the tone of them
7  accelerates when apparently the victim doesn't respond, and
8  they demonstrate a great deal of instability, it seems to me,
9  on the part of your client and a complete lack of self-control
10 where this particular individual is concerned.
11         You know, on the order of protection, it's not
12 surprising to me that the victim didn't show up at the hearing,
13 frankly, given the abuse and threats that have been directed at
14 her by your client over a long period of time.  You're correct
15 in noting that the contact between the victim and your client
16 has lessened, but it hasn't been eliminated.
17         This most recent set of Facebook messages where the
18 defendant seems to be saying -- you know, I can't remember the
19 exact quote, but it's words to the effect of, you know, a joint
20 suicide/homicide, you know, sounds good to him right now.  Now
21 even if he doesn't literally mean that, it demonstrates to me,
22 as I said, instability and a lack of control over his own
23 actions.
24         That does not make him a particularly good candidate
25 for bond because bond depends on -- release depends on the

1  client's or the defendant's ability to understand, appreciate,
2  and follow orders, and it doesn't seem to me that your client,
3  especially with respect to this individual, would be able to do
4  that.
5      I'd note for the record that he wasn't even able to
6  keep himself under control during our first hearing.  I could
7  count on two fingers the number of times I've had a defendant
8  yell at me essentially during his initial appearance because he
9  didn't think he was getting a hearing fast enough.  That's the
10 least of my concerns, but it does sort of tell me that this is
11 a guy who doesn't like being told no, especially not by this
12 victim.
13     I'm just -- you know, the suggestion that he could be
14 living or that he could live on his own without a third party
15 custodian I think is completely a non-starter.  I just don't
16 think or just don't believe that there are conditions I can
17 fashion.
18     Location monitoring helps to some extent, but we all
19 know that if this defendant, who at one point in the text
20 messages actually says he knows he's going to jail -- I thought
21 I read that at some point -- if he wants to do something, if he
22 wants to go someplace and he loses control, he's going to be
23 able to, and I just can't take that risk.  I can't take the
24 risk that he's not going to hurt this person, and I can't take
25 the risk that he's not going to hurt himself, as things have

1 really not gone well and now he's under federal indictment for
2 this behavior.
3 So I think the Government has met its burden to show
4 by clear and convincing evidence that Mr. Schwartz is a danger
5 to the community. So for all the reasons underlying the
6 evidence submitted by the Government in advance of this
7 hearing, I find that he's a danger to the community and I will
8 order him to be held in the custody of the United States
9 Marshals until further court proceedings.
10 Is there anything further we need to take up? Is
11 Mr. Schwartz going to want a preliminary hearing in this case?
12 MR. COSLEY: Yes, Judge. At this time I haven't
13 talked to him about it, but I'll have to say yes.
14 THE COURT: Well, I suggest you talk to him before we
15 schedule it.
16 MR. COSLEY: Okay.
17 THE COURT: I don't want to set aside what would
18 probably be an hour or an hour and a half and would require a
19 video, you know, a link for video, until I'm quite sure that
20 one is going to be necessary. So if you could, Mr. Cosley,
21 have that conversation with your client --
22 MR. COSLEY: I will.
23 THE COURT: -- sometime tomorrow, then my deputy will
24 have to schedule the hearing rather soon because he is in
25 custody.

1  MR. COSLEY: Okay.

2  THE DEFENDANT: Am I --

3  THE COURT: Okay.

4  THE DEFENDANT: I'm sorry, Your Honor. Am I able to
5  speak?

6  THE COURT: Oh, go ahead --

7  THE DEFENDANT: This is Matthew Schwartz.

8  THE COURT: -- sir. You can say whatever you'd like,
9  but I've ruled.

10 THE DEFENDANT: I understand. I understand, and I
11 understand, you know, where you're coming from and why you made
12 the decision you've made. What I will say is that I had a very
13 strong relationship with this individual and I had very strong
14 feelings, and there was extenuating circumstances. You know,
15 I'm sure there are two sides to every story, I'm sure, but she
16 put me through a great deal and at the time I was, you know,
17 very heated. I think the only time --

18 THE COURT: All right. I'm sorry. I thought that
19 Mr. Cosley was speaking. I didn't know this was the defendant.

20 THE DEFENDANT: Oh, I'm sorry. No, this is Matthew
21 Schwartz.

22 THE COURT: I'm so sorry, Mr. Schwartz. Number one,
23 as I've already cautioned you in the hearing a few days, it is
24 not a good idea for you to (inaudible) which can be used
25 against you.

1  THE DEFENDANT: I understand that.

2  THE COURT: No, you clearly don't understand that
3  because you just made statements which frankly were not in your
4  best interest to make.

5  THE DEFENDANT: Well --

6  THE COURT: What I'm going to tell you right now, I
7  would hope that Mr. Cosley would agree with me. He is your
8  able counsel. You need to be quiet.

9  THE DEFENDANT: Okay. I just -- there's nothing I can
10 say?

11 MR. COSLEY: No.

12 Judge, may I?

13 THE COURT: I can't stop you from talking,
14 Mr. Schwartz. I'm advising you that it is not in your best
15 interest.

16 THE DEFENDANT: I understand. I would just, you know,
17 like to say that I have not spoken to her since the --

18 MR. COSLEY: All right, Matthew. That's enough.

19 THE COURT: All right. I'm cutting this off.

20 THE DEFENDANT: Okay.

21 THE COURT: Mr. Cosley, you need to discuss this with
22 your client.

23 THE DEFENDANT: Okay.

24 THE COURT: If he's going to -- hold on. If he's
25 going to appear in the future before a district judge, he needs

1 to understand that you speak for him. That's why he pays you.
2     MR. COSLEY: Right.
3     THE DEFENDANT: Understood.
4     THE COURT: Okay?
5     MR. COSLEY: Judge, do we set a status date from here,
6 and is there a way to --
7     THE COURT: No, what I'd like you to do, what I'd like
8 you to do, as I said, I'd like you to have a conversation with
9 your client about the preliminary hearing, and you can discuss
10 that with Ms. Klamann.
11     MR. COSLEY: Okay.
12     THE COURT: If you could do that in the next, you
13 know, 24 hours, I need to know because we'll schedule it. I
14 don't have my calendar in front of me. I want to make sure
15 this is something your client wants to do, and I want you to
16 have the opportunity to talk with him thoroughly about, you
17 know, what that is and whether he wants to do that. Then if he
18 does, of course, we'll schedule it. You can just email or call
19 my deputy.
20     MR. COSLEY: Okay.
21     THE COURT: Okay?
22     MR. COSLEY: Fair enough. Then I'll talk to the jail
23 about talking to Mr. Schwartz. I assume I can set that up
24 through the jail.
25     THE COURT: Yes, you can. Yes, you can. All right.

1  Thank you, everyone.
2       Ms. Klamann, if you could send me a detention order,
3  that would be great.
4       MS. KLAMANN:  I will.  Thank you.
5       THE COURT:  You can send it to Ms. Perdue.  Thank you.
6       Thanks, everybody.
7       MS. KLAMANN:  Thank you.
8       MR. COSLEY:  Thank you.
9       THE COURT:  Bye-bye.
10      (Proceedings concluded.)
11                    C E R T I F I C A T E
12      I, Patrick J. Mullen, do hereby certify that the
13  foregoing is an accurate transcript produced from an audio
14  recording of the proceedings had in the above-entitled case
15  before the Honorable SUSAN E. COX, one of the magistrate judges
16  of said court, at Chicago, Illinois, on June 1, 2021.
17
18                          */s/ Patrick J. Mullen*
                            Official Court Reporter
19                          United States District Court
                            Northern District of Illinois
20                          Eastern Division
21
22
23
24
25