UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21 CR 316 |
| v. | Judge Andrea R. Wood |
| MATTHEW SCHWARTZ | |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., the United States Attorney for the Northern District of Illinois, respectfully submits its response in opposition to defendant MATTHEW SCHWARTZ's motion for pretrial release. Dkt. Entry 57. Defendant moves this Court for release and proposes conditions of release that include home incarceration, mental health and substance abuse treatment, residence at his parent's home, posting of property as bond, and internet and telephone restrictions. The government submits that the proposed conditions are not sufficient to assure the safety of any other person – namely defendant's two victims – and the community, given the seriousness of the charged crimes, the seriousness of defendant's other conduct and defendant's actions to impede and obstruct the government's investigation since being incarcerated. For these reasons, and as set out more fully below, the government respectfully requests that the Court deny defendant's motion for release.

**I.    Defendant's Threats Against and Stalking of Victim A**

On May 19, 2021, Magistrate Judge David Weisman signed a criminal complaint charging defendant with transmitting threats in interstate commerce in

1

violation of Title 18, United States Code, Section 875(c). Dkt. Entry 1. On June 22 2021, the grand jury returned an indictment charging defendant with one count of cyberstalking (Count One) and three counts of transmitting threats in interstate commerce (Counts Two to Four). Dkt. Entry 27.

The complaint affidavit sets out the facts underlying these charges. It details how defendant, over the course of a little more than a year, undertook a campaign to threaten, harass and intimidate his former girlfriend ("Victim A") after she ended their relationship. *Id.* In summary, defendant stalked Victim A, he created flyers depicting Victim A and accusing her of being a prostitute with the intent of disseminating them to her neighbors. *See* Exhibit 17. Defendant left items at Victim A's home, and he stole or instructed another person to steal her dog from her home. He sent her dozens, if not hundreds, of threatening text messages from disguised phone numbers that he created using a cell phone application called the Burner App. A number of these messages contained violent and extremely threatening language.

For example, on May 31, 2020, defendant sent Victim A a text from an unknown number stating, "I'm going to attack the fuck out of you and kill you dead if you do not start talking to me I'm not fucking kidding." *See* Exhibit 1. Later that day, he texted her, "I wanna kill you I swear to god if you don't come here and talk to me about the shit I'm gonna fucking kick you fucking little ass I'm gonna kick it at [and] my stop [stomp] your fucking head to the curb until cracked open fucking hate you bitch." *Id.* Defendant continued to send Victim A anonymous texts for several months after this. On November 3, 2020, defendant again texted Victim A and said,

"You know the endgame is designed so that you don't get hurt. And in fact it ends with you in a good place. I can change that. So that it ends with you getting ended. And I could end with you getting ended in one of three ways 1) quick and painless. 2) slow and painful 3) a kind of living death. But I chose option 4) you not getting ended at all. Don't fuck with me or I will become most people. I will choose #2 instead of #4. Don't be dumb. I really don't want to hurt you that way. I don't want to do #1, 2, 3. Don't make me. Don't fuck me up. Don't antagonize me." Exhibit 2. Defendant continued to send Victim A anonymous texts for several more weeks. On November 27, 2020, defendant texted Victim A, "I should have just killed you. But I couldn't live with myself. And now the best choice is for me to kill myself… And now you just ignore me. You think that will make me go away. It just strengthens my resolve. If I decide to kill myself – and I'm close to that decision. You could be damn sure I'll be taking you and your flavor of the day with me." Exhibit 3.

      Defendant's use of disguised numbers, the violent, menacing and threatening tone of these messages, and his persistence in contacting Victim A over a long period of time show that defendant's actions were not the result of a temporary fit of anger. He was calculated, he was deliberate and he intended to scare, intimidate and harass Victim A into doing what he wanted her to do.

      In fact, defendant persisted in contacting Victim A even when she took legal action. In December 2020, after receiving the above messages, Victim A obtained an order of protection against the defendant. *See* Exhibit 4. During the time the order of protection was in place, the defendant contacted Victim A at least once, in January

2021. Exhibit 5. In other words, defendant disregarded a court order explicitly instructing him not to have contact with Victim A and contacted her anyway. Despite defendant's representations in his text message that he would not fight the order of protection, defendant moved to vacate the order of protection in February 2021. Exhibit 6. That motion was granted in May 2021 and the order of protection was vacated. Defendant wasted no time in contacting Victim A after the order was vacated, sending her a text message only a week later. Exhibit 7.

Defendant's threats culminated in May 2021 when the Inverness Police Department was contacted by an individual who reported that he or she had received some disturbing messages from the defendant. *See* Exhibit 8. Specifically, defendant sent the person messages on Facebook saying, "I don't know how its come to this So yeah a killing spree/suicide is sounding pretty good these days." The criminal complaint was filed and defendant was arrested shortly after he made these statements.

A few days before defendant's arrest, law enforcement executed a search warrant at defendant's residence in Inverness, Illinois. Law enforcement located and seized a number of items pursuant to the warrant, including suspected narcotics and narcotics paraphernalia. Exhibits 9 and 10. While no weapons were found during the search, law enforcement did locate a whiteboard in a room that appeared to be defendant's office with a list of "to do" items. The list included "Foid [Firearm Owners Identification Card]," indicating defendant at least had plans to obtain a gun. Exhibit 11. Law enforcement also located a number of items on defendant's electronic devices

including copies of emails that defendant sent from a fake email address to Victim A's property management company trying to get Victim A evicted from her apartment (*See* Exhibit 18), copies of the flyer defendant made depicting Victim A that he intended to disseminate to her neighbors, and an email to defendant's assistant describing ways the assistant could dig up information on Victim A. Finally, the government also located three tracking devices in a safe in defendant's residence. A witness told law enforcement that the witness had conversations with the defendant previously about possibly placing one of the trackers on Victim A's car.

The nature and circumstances of the offense here are extremely serious and support defendant's continued detention. Defendant threatened and harassed Victim A for a long period of time. He followed her, tried to get her evicted, stole her dog and sent many threatening text messages to her from anonymous numbers. As recently as May 2021, he expressed the desire to go on "a killing spree," and apparently had plans to obtain a gun. The fact that law enforcement apprehended defendant before he could carry out any of his threatened violence should not be a factor in support of defendant's release. Defendant has also not been deterred from contacting Victim A even when there was a court order in place prohibiting him from doing so. Thus, the government can show by clear and convincing evidence that defendant is a danger to the community– namely Victim A – if released.

**II. Additional Conduct Involving Minor A**

Defendant is also a danger to the community because of his sexual involvement with a minor (Minor A). The government's application and affidavit in support of the

warrant to search defendant's residence (Dkt. Entry 9) lays out in detail the government's investigation with respect to defendant's activities with Minor A. In summary, Minor A was 16 years old in August 2018 when Minor A began having sex with defendant in exchange for money. Defendant paid for Minor A's travel back and forth from Minnesota, where Minor A resided, for the purpose of providing defendant with companionship and sex. Defendant also paid Minor A an "allowance" of up to $5,000 a month. Minor A told law enforcement that Minor A believed defendant found out Minor A was 16 years old near the end of 2018 when he found Minor A's driving permit. In an email that defendant sent to the investigating agent on December 3, 2020, defendant admitted that, at least as of the time of the email, he knew that Minor A was underage but claimed that he never had sex with her. *See* Exhibit 12. Specifically, defendant stated, "I found out much later that she was a 16 year old runaway! Yikes! Thankfully, I never slept with her." *Id.*

Unfortunately, defendant's claim that he never had sex with Minor A was a lie. Pursuant to the warrant to search defendant's residence, law enforcement seized a number of electronic devices and electronic storage media. On one of those devices – specifically, a USB flash drive – law enforcement identified a video depicting defendant having sex with Minor A. The date stamp on the video indicates it was made on August 26, 2018, at a time when Minor A was 16 years old. From the context of the video, it does not appear that Minor A was aware they were being filmed. Defendant had this video in his possession – despite his admission to the FBI that he

6

knew Minor A was underage as of December 2020 – on May 24, 2021, the day of the search warrant.

Defendant preyed on Minor A. He used his wealth to entice Minor A – who at the time was a ward of the State of Minnesota – to engage in sex acts with him. He secretly recorded her engaging in those acts, creating and possessing child pornography. He kept that recording in his personal collection despite his knowledge that Minor A was underage and without Minor A's consent. Defendant's actions with respect to Minor A also prove by clear and convincing evidence that he is a danger, not only to Victim A but also Minor A, and should continue to be detained.

### III. Defendant's Attempts to Obstruct Justice While Incarcerated at the MCC

In case defendant's crimes against women and minors as described above are not sufficient to warrant his continued detention (the government believes they are), defendant has also attempted to obstruct the government's investigation while he's been in custody, demonstrating that even incarceration is not enough to deter defendant from additional criminal conduct. Specifically, defendant has contacted or attempted to contact both Victim A and Minor A since he's been incarcerated at the MCC in an effort to obstruct the government's ongoing investigation.

For example, defendant's original detention hearing before Judge Cox took place on June 1, 2021 at 2:00 p.m. Defendant has attached the transcript of that hearing as Exhibit 2 to his motion for release. It is notable that Judge Cox stated, as part of her reasoning for detaining defendant that defendant demonstrated, "a complete lack of self-control where this particular individual [Victim A] is concerned."

Tr. 14:9-10. After the detention hearing was over, defendant wasted no time in proving Judge Cox right. No sooner had the detention hearing ended than defendant called an acquaintance and instructed the acquaintance to get in touch with the Victim A. *See* Exhibit 13. Specifically, at approximately 2:30 p.m., defendant called his acquaintance from the MCC and said, "she's [Victim A] gotta drop the charges" and "can you try to talk to her?" He then directed the acquaintance to a website to locate contact information for Victim A. The defendant ended the call by saying, "see what you can do, okay? Thank you, you're my only hope. Otherwise, I'm stuck."

So despite the fact that defendant had just been ordered detained by Judge Cox upon a finding that she did not believe he could keep away from Victim A, he immediately attempted to contact Victim A through another person. And he instructed his acquaintance to contact Victim A for the purpose of getting Victim A to "drop the charges." Defendant's actions show he has no regard whatsoever for the orders of this Court. Defendant attempted to contact Victim A despite his obvious awareness that he was not supposed to. Defendant had just sat through a long detention hearing where his failure to follow orders not to contact Victim A was discussed at length and cited as a primary reason for his continued detention. Yet, defendant immediately did just that. And he attempted to contact Victim A in order to obstruct the government's investigation.

Defendant also tried to influence Minor A in an effort to stave off additional charges. Specifically, defendant appeared to become aware that the government knew about his involvement with Minor A in approximately July 2021 and decided to have

8

Minor A marry him in the hopes of keeping Minor A from being a witness against him. *See* Exhibit 14. Specifically on July 6, 2021, defendant emailed Minor A[1] stating, "I'm working on getting the forms and getting this setup with the chaplain!" *Id*. The next day, defendant told Minor A, "I've been told very clearly told by my attorney this morning that I am not allowed to talk to you anymore until my case is over. AS you might be a witness in this case." *Id*. Defendant then gave Minor A contact information for his attorney. Despite acknowledging that he was told not to contact Minor A, defendant continued to exchange emails with Minor A over the next few days. *Id*. On July 12, 2021, Minor A emailed defendant saying, "the charges are serious Matt… & I don't know how else to help you but marry you." *Id*. Defendant responded the same day and told Minor A to contact his friend. *Id*.

Defendant and Minor A also had at least one phone call about their plan to marry to keep Minor A from having to testifying against defendant. Specifically, on July 18, 2021, defendant called Minor A. *See* Exhibit 15. Defendant told Minor A that Minor A could have defendant's Tesla. Near the end of the call, defendant and Minor A discuss their marriage plans. *Id*. at 10:20. Minor A asked if defendant didn't have visitation, how would he be able to get married. *Id*. Defendant responded that he should get visitation but if not, they can get married when he gets out. *Id*. He also noted that his friend is an ordained minister. *Id*.

Five days later on July 23, defendant had a phone call with the friend that he referenced in his call with Minor A. *See* Exhibit 16. Defendant immediately said to

---

[1] At this time, Minor A was no longer underage.

9

his friend, "Tell me you didn't talk to my attorneys about THAT." *Id.* at 00:50. His friend replied, "I didn't talk to them about getting married or any of that stuff, no." *Id.* Defendant said, "You didn't talk to them about that?" *Id.* She replied, "No." *Id.* He said, "Thank you!" *Id.* Then he told her, "we can't talk about it" and "they record everything." *Id.* He said, "this topic [marrying Minor A] has to just go away." *Id.*

These calls and emails show that defendant was communicating with Minor A even though he knew that Minor A was a witness and victim in this investigation and even when he had been warned by his attorney not to talk to Minor A. They also show that the purpose of defendant's communications with Minor A was to arrange to marry Minor A with the goal of keeping Minor A from being a witness against him. So once again, defendant completely disregarded the law and attempted to obstruct the investigation by essentially bribing Minor A into marrying him. And defendant did all of this while in custody. Defendant's repeated and persistent attempts to impede, obstruct, intimidate or tamper with witnesses clearly demonstrates that there is no condition or combination of conditions that can protect the community from more crimes by the defendant, as even detention is not a sufficient deterrent to keep defendant from committing new crimes.

### IV. Conclusion

In summary, the defendant has: (1) threatened, harassed, stalked and intimidated an ex-girlfriend; (2) threatened to go on a "killing/suicide spree"; (3) paid for sex with a minor; (4) secretly recorded himself having sex with a minor; (5)

engaged in witness tampering from jail; and (6) attempted to obstruct justice from jail. Defendant is a danger to the community and should not be released from custody.

Dated: February 4, 2022                    Respectfully submitted,

                                                                          JOHN R. LAUSCH, JR.
                                                                          United States Attorney

                                                By:    */s/ Kaitlin Klamann*
                                                           KAITLIN KLAMANN
                                                           Assistant U.S. Attorney
                                                           219 South Dearborn St, 5th Floor
                                                           Chicago, Illinois 60604