UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW SCHWARTZ | No. 21 CR 316<br><br>Judge Andrea R. Wood |

**GOVERNMENT'S SENTENCING MEMORANDUM**

THE UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully asks the Court to sentence defendant MATTHEW SCHWARTZ to a term of imprisonment within the Guidelines range and a three-year term of supervised release, including the conditions specified in the Presentence Investigation Report ("PSR").

**I. Offense and Relevant Conduct**

    **A. Conduct and Possession of Images of Child Pornography Involving Minor A**

As described in defendant's Plea Agreement, the PSR, and the Government's Version of the Offense, defendant preyed on Minor A, a female runaway and a ward of the state from Minnesota. PSR ¶ 8. Defendant began a sexual relationship with Minor A after meeting her online when she was 16 years old. *Id.* Defendant paid Minor A for her companionship with cash and gifts, including a vehicle, as well as for her to travel from out of state to his homes in Buffalo Grove, Illinois, and Inverness, Illinois, for the purpose of engaging in sexual acts with him. PSR ¶ 7.

Pursuant to a warrant to search defendant's residence, law enforcement seized a number of electronic devices and electronic storage media. On one of these devices,

1

a San Disk USB thumb drive, law enforcement identified a video of defendant penetrating Minor A's vagina with defendant's penis. PSR ¶ 6. Defendant admitted that he knew that the video depicted Minor A at a time when she was under the age of eighteen. PSR ¶ 7.

### B. Defendant's Threats Against and Stalking of Individual A

The investigation of the child pornography offense against Minor A led to an investigation involving the stalking of defendant's former girlfriend ("Individual A"). Defendant met Individual A online. PSR ¶ 20. Defendant and Individual A then began a romantic relationship, which eventually led to an engagement. *Id.*

Over the course of a little more than a year—from about March 2020 through and including May 2021—defendant waged a campaign to threaten and harass Individual A after she ended their relationship. For example, in March 2020, defendant, or another individual acting at defendant's direction, broke into Individual A's residence and stole her dog. PSR ¶ 11. In April 2020, defendant placed a shovel with the words "1st place gold digger," "cheater," "liar," "slut," "whore," "skank," and "asshole," written on it at the entrance to Individual A's garage. Defendant also left at her residence a book titled "*The Ethical Slut*." *Id.* In June 2020, defendant stole Individual A's car, a black 2015 Mercedes Benz, by changing the title of the car into his name. PSR ¶¶ 14, 18.

Throughout this period, defendant also physically stalked Individual A by driving past her residence or parking near her residence. In or around April 2020, defendant installed a tracking device on Individual A's vehicle, without Individual A's knowledge, to enable defendant to know Individual A's whereabouts. PSR ¶ 12.

Defendant also obtained the password to Individual A's Apple iCloud account and attempted to access her account to obtain her private information. PSR ¶¶ 12, 18.

Beginning in May 2020, defendant began to use a mobile application called the Burner App to send dozens of threatening text messages to Individual A from disguised phone numbers. PSR ¶ 13. Defendant used the Burner App to message Individual A because Individual A had blocked defendant's phone number from contacting her. *See id.* For example, on May 31, 2020, defendant used the Burner App to send Individual A several text messages from an anonymous phone number, including the following statements by defendant: "I am going to attack the fuck out of you and kill you dead if you do not start talking to me I'm not fucking kidding . . . you deserve to be choked … you need to come talk to me or things are gonna get really fucking bad I'm going to prison anyway bitch so who the fuck cares . . . honestly deaths too good for you." *Id.*

Defendant continued to send Individual A anonymous texts for several months. On November 3, 2020, defendant used the Burner App to send Individual A several more text messages from another anonymous phone number. The messages included the following statements by defendant: "You know the endgame is designed so that you don't get hurt. And in fact it ends up with you in a good place. I can change that. So that it ends with you getting ended. And I [it] could end with you getting ended in one of three ways. 1) quick and painless. 2) slow and painful 3) a kind of living death . . . just be happy I'm taking the high road and not hurting you. Most people would choose a different path. Don't fuck with me or I will become most people. I will choose

3

#2 . . ." PSR ¶ 15.

On November 27, 2020, defendant used the Burner App to send Individual A several more text messages from another anonymous phone number. The messages included the following statements by defendant: "I should have just killed you. But I couldn't live with myself. And now the best choice is for me to kill myself. . . And now you just ignore me. You think that will make me go away. It just strengthens my resolve. If I decide to kill myself – and I'm close to that decision. You could be damn sure I'll be taking you and your flavor of the day with me." PSR ¶ 16.

In December 2020, defendant created flyers depicting Individual A that defendant intended to distribute in Individual A's neighborhood. PSR ¶ 17. The flyers stated that Individual A was a prostitute and a drunk. *Id.* The flyer encouraged Individual A's neighbors to contact her management company and demand she be removed from her residence. *Id.* Defendant also created a Google email address, cconcerned703@gmail.com, which he used to contact Individual A's management company and request that she be "removed from the community." *Id.* Defendant created the flyers and Google email account with the intention of getting Individual A evicted from her home. *Id.*

Critically, defendant's conduct towards Individual A was not the result of a fit of anger. His use of disguised numbers and a tracking device, his menacing tone, and the repeated and prolonged nature of his tactics show that his actions were calculated and intended to intimidate and manipulate her.

4

## II.     The PSR and Advisory Guideline Calculations

The government agrees with the Probation Officer's determination that the adjusted offense level for Count One is 27. PSR ¶ 32. With regards to the Stipulated Offense, however, the government believes that that the adjusted offense level is 20, rather than 22. *See* PSR ¶ 38. The government agrees with the Probation Officer that the Stipulated Offense is subject to an enhancement under Guideline § 2A6.2 because the offense involved a "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim," as provided in Guideline § 2A6.2(b)(1)(E). PSR ¶ 34. The Application Notes to the Guideline define "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim" to mean "any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim[.]" USSG § 2A6.2 n.1. As he admitted in his Plea Agreement, and as described above, defendant repeatedly stalked, threatened, and harassed Individual A—breaking into her residence, installing a tracking device on her car, and sending her threatening and disturbing messages, among numerous other instances—between March 2020 and May 2021. The government disagrees, however, with the Probation Officer's notation in the PSR that defendant is thus subject to a four-level enhancement. *See* PSR ¶ 34. Because the offense involved only one of the subdivisions under Guideline § 2A6.2(b)(1), it is subject to a two-level enhancement. USSG § 2A6.2(b)(1).[1]

---

[1] In the Plea Agreement, the government proposed that the four-level enhancement might apply; however, it now believes that the two-level enhancement is appropriate. This does not

5

Applying the grouping rules to these two offenses, the combined adjusted offense level is 28, which is reduced by 3 levels for acceptance of responsibility for a total offense level is 25. Combined with defendant's criminal history category of I, this results in an advisory Guidelines range of 53 to 71 months' imprisonment.[2]

### III.     Application of 18 U.S.C. § 3553(a) Sentencing Factors

Title 18, United States Code, Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.[3] To determine the sentence, the Court must consider the statutory factors listed in 18 U.S.C. § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reflects that a sentence within the advisory Guidelines range is warranted and necessary.

---

change the total offense level from what is listed in the Plea Agreement once the grouping rules are applied.

[2] The Plea Agreement contemplated a higher Guidelines range based on no reduction to the offense level for acceptance of responsibility.

[3] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

## A. Term of Imprisonment

Defendant undoubtedly committed serious offenses. To begin, defendant took advantage of Minor A and her vulnerability. He used his wealth to entice Minor A—who at the time was a ward of the State of Minnesota—to engage in sex acts with him. He secretly recorded her engaging in those acts, creating and possessing child pornography. He kept that recording in his personal collection despite his knowledge that Minor A was underage and without Minor A's consent.

Defendant's stalking of and threats towards Individual A are similarly serious and alarming. As the Probation Officer has recognized, defendant's stalking of and threats towards Individual A were not one-time lapses in judgment, but rather a deliberate pattern of distressing criminal behavior. *See* PSR ¶ 34. Defendant threatened and harassed Individual A for more than a year—following her, trying to get her evicted, breaking into her apartment, stealing her dog, and sending threatening messages to her, including death threats, from anonymous telephone numbers. The psychological impact of this conduct is undoubtedly significant, and Individual A has sought out mental health treatment to cope with the trauma defendant inflicted on her. Moreover, as the Probation Officer notes, defendant could have easily acted upon these threats. Probation Sentencing Recommendation at 2.

The government credits that defendant has a limited criminal history, consisting of traffic related issues, and no prior convictions. PSR ¶¶ 53–54. He has a stable work history and a strong family support system, with parents who are willing to help him integrate back into society upon his release from custody. PSR ¶¶ 61, 81–82. He also suffers from depression and anxiety and has a history of substance abuse,

and he has received prior treatment for these conditions. PSR ¶¶ 69-71, 76. While somewhat mitigating, however, these factors are also potentially aggravating, as neither the ongoing support of defendant's family, nor prior treatments and therapies, prevented defendant from victimizing Minor A or Individual A. *See United States v. Portman*, 599 F.3d 633, 637 (7th Cir. 2010), *as amended* (Mar. 24, 2010) ("[A] defendant must show why personal characteristics act as a mitigating, not potentially aggravating factor[.]")

### B. Restitution

#### 1. Restitution for Minor A

Under 18 U.S.C. § 2259, restitution must be ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim. 18 U.S.C. § 2259((b)(2)(B). The AVAA's definition of "trafficking in child pornography" includes violations of 18 U.S.C. § 2252 and 18 U.S.C. § 2252A(a)(1)-(5) (including possession, receipt, transportation, distribution, and access with intent to view child pornography). 18 U.S.C. § 2259(c)(3). The defendant must pay the "full amount of the victim's losses" that that were incurred or "are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim." 18 U.S.C. § 2259(c)(2). These include:

    (A)    medical services relating to physical, psychiatric, or psychological care;

    (B)    physical and occupational therapy or rehabilitation;

    (C)    necessary transportation, temporary housing, and child care expenses;

    (D)    lost income;

> (E) reasonable attorney's fees, plus any costs incurred in obtaining a civil protection order;
>
> (F) any other losses suffered by the victim.

*Id*. Section 2259(b)(4)(A) makes restitution mandatory. A court may not decline to issue a restitution order because of "the economic circumstances of the defendant" or "the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." 18 U.S.C. § 2259(b)(4)(B).

The government bears the burden of proving the restitution amount by a preponderance of the evidence. 18 U.S.C. § 3664(e). ("Any dispute as to the proper amount of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government.").

The government respectfully requests an order of restitution to Minor A in the amount of $9,050, or in another amount deemed fair and equitable by the court. Defendant has agreed to this request. The government's request includes the following losses to Minor A:

- $750, which is the approximate cost of medical care stemming from defendant's conduct; and
- $8,300 in future psychotherapy costs for Minor A relating to trauma suffered resulting from defendant's conduct.

9

Regarding future psychotherapy costs, the Seventh Circuit has stated that "a restitution order can include payments to victims of the offense for the projected cost of future mental health treatment." *United States v. Dickey*, --- F.4th ---, 2022 WL 15654247, at *5 (7th Cir. 2022). There is consensus that survivors of child pornography trafficking offenses are at a heightened risk for post-traumatic stress disorder (PTSD) and other psychological issues. *See* Hanson, Rochelle F. and Elizabeth Wallis, Treating Victims of Child Sexual Abuse, The American Journal of Psychiatry, available at https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2018.18050578; last accessed November 21, 2022; *see also* Williamson, Erin, et. al., Evidence-Based Mental Health Treatment for Victims of Human Trafficking, United States Dept. of Health and Human Services, available at https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43466/index.pdf, last accessed November 21, 2022.

The length, and nature, of effective treatment for PTSD is highly individualized. However, as discussed in the above articles, trauma-focused cognitive behavioral therapy is a typical method of treatment. Few large-scale studies regarding cost of PTSD therapy exist, due to the inherent variability in the intensity and duration of the treatment. In 2012, the Congressional Budget Office examined the Veteran's Administration's costs of providing PTSD to veterans, and concluded that, on average, PTSD treatment costs approximately $8,300 per person in the first year (adjusted to 2011 dollars). *See* The Veterans Health Administration's Treatment

of PTSD and Traumatic Brain Injury Among Recent Combat Veterans, available at https://www.cbo.gov/sites/default/files/cbofiles/attachments/02-09-PTSD.pdf, last accessed November 21, 2022. For this reason, the government requests $8,300 in mental health therapy costs to cover the first year of Minor A's treatment, a conservative estimate given Minor A may require treatment for the remainder of her natural life.

### 2. Restitution for Individual A

The special cyberstalking restitution statute requires that an order of restitution direct the defendant to pay the victim "the full amount of the victim's losses." 18 U.S.C. § 2264(b)(1). The term "full amount of the victim's losses," as defined in 18 U.S.C. § 2264(b)(3), largely mirrors the definition provided in § 2259(c)(2). Also, like matters involving restitution under § 2259, restitution under § 2264 is mandatory. 18 U.S.C. § 2264(b)(4). The government similarly bears the burden of proving the restitution amount by a preponderance of the evidence. 18 U.S.C. § 3664(e).

The government respectfully requests an order of restitution to Individual A in the amount of $21,211, or in another amount deemed fair and equitable by the Court. Defendant has agreed to this request. The government's request includes the following losses to Individual A:

- $500, which is the amount of the security deposit Individual A forfeited to her landlord as a result of damage caused by defendant breaking into her former residence;

11

- $360, which is the approximate cost of operating an alarm system and security camera following defendant's break-in of Individual A's former residence for the 18-month period between the break-in and Individual A moving to a new residence;

- $200, which is the approximate cost of renting a U-Haul to move to a new apartment after Individual A's former landlord refused to renew her lease due to damage to the property caused by defendant's break-in;

- $11,700, which is the approximate increase in rent that Individual A has paid for her new apartment relative to her old apartment after her former landlord refused to renew her lease due to damage to the property caused by defendant breaking in, for the 13-month period from her move in date on October 1, 2021, to the present;

- $151, which is the cost of changing the title and registration of Individual A's vehicle after defendant stole the vehicle by changing its title to his name, per the Illinois Secretary of State; and

- $8,300 in future psychotherapy costs for Individual A relating to trauma suffered resulting from defendant's conduct.

Regarding future psychotherapy costs as pertains to Individual A, victims of cyberstalking suffer high levels of psychological distress, with symptoms that are comparable to those seen in patients with PTSD. *See* Short, Emma, et. al., The Impact of Cyberstalking, Studies in Media and Communication, available at https://core.ac.uk/download/pdf/228084254.pdf, last accessed November 21, 2022. As

explained above, the government estimates that the cost of psychotherapy for victims of PTSD amounts to $8,300 for the first year of treatment. For this reason, the government requests $8,300 in mental health therapy costs to cover the first year of Individual A's treatment, a conservative estimate given Individual A may require treatment for the remainder of her natural life.

      **C.**    **Supervised Release Conditions**

The government suggests that, following his term of imprisonment, defendant be placed on supervised release for a period of three years. A three-year term is warranted here based on defendant's repeated stalking and harassment of Individual A, his predatory conduct towards Minor A, and the need to ensure the safety of the public and facilitate defendant's treatment. The government agrees with, and requests that defendant be required to comply with, the conditions set forth in paragraph 91 of the PSR, all of which will facilitate supervision by the Probation Office, promote defendant's respect for the law, deter him from committing future crimes, and support his rehabilitation.

      **D.**    **Additional Penalties**

In addition to the penalties described above, defendant should be required to forfeit the following specific property to the United States identified in the superseding information: a SanDisk USB thumb drive seized on May 24, 2021, and any other property which contains visual depictions described in 18 U.S.C. § 2252A. These items represent property that facilitated the offense and was involved in the offense. The government will separately move for a preliminary order of forfeiture.

Defendant will also be subject to a $100 special assessment pursuant to 18 U.S.C. § 3013, as well as an additional $5,000 if the Court determines that he is a non-indigent person pursuant to 18 U.S.C. § 3014.

The government does not recommend a fine in this case.

## IV. Conclusion

For the foregoing reasons, the government requests that the Court sentence defendant to a term of imprisonment within the applicable Guidelines range, followed by a supervised release term of three years, and order the defendant to pay restitution in the amount of $9,050 to Minor A and in the amount of $21,211 to Individual A.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Irene Hickey Sullivan*
IRENE HICKEY SULLIVAN
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5342

Dated: November 28, 2022